**UNITED STATES DISTRICT COURT FOR**
**THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ROBERT BEYER, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. _______________ |
| | ) | |
| v. | ) | JURY TRIAL DEMANDED |
| | ) | |
| CONSOL COAL RESOURCES LP, JIMMY A. BROCK, MARTHA A. WIEGAND, MICHAEL L. GREENWOOD, DEBORAH J. LACKOVIC, KURT R. SALVATORI, DAN D. SANDMAN, and JEFFREY L. WALLACE, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934**

Plaintiff, Robert Beyer ("Plaintiff"), by his undersigned attorneys, for this complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel, as to all other allegations herein, as follows:

**NATURE OF THE ACTION**

1. This is an action brought by Plaintiff against CONSOL Coal Resources LP ("CCR") or the "Company") and the members of the Company's board of directors of the General Partner (collectively referred to as the "GP Board" or the "Individual Defendants" and, together with CCR, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a) and Rule 14a-9, 17 C.F.R. § 240.14a-9. Plaintiff's claims arise in connection with the proposed merger between CONSOL Energy Inc. ("Consol Energy"), Transformer LP Holdings Inc. ("Holdings"), a wholly-owned subsidiary of Consol, Transformer Merger Sub LLC ("Merger Sub"), a wholly-owned subsidiary of Holdings,

CONSOL Coal Resources GP LLC ("GP"), general partner of CCR, and CCR (the "Proposed Transaction").

2. On October 22, 2020, CCR entered into an agreement and plan of merger with Consol Energy, Holdings, Merger Sub, and GP (the "Merger Agreement"), whereby Merger Sub will merge with and into CCR, with CCR surviving the merger as an indirect, wholly-owned subsidiary of Consol Energy. The Conflicts Committee of the GP Board, consisting of Michael L. Greenwood, Dan D. Sandman, and Jeffrey L. Wallace ("Conflicts Committee"), approved the Merger Agreement, recommended to the GP Board approval of the Merger Agreement, and recommended that the GP Board recommend approval of the Merger Agreement to the CCR Limited Partners.

3. Upon consummation of the Proposed Transaction, each CCR Common Unit will be converted into the right to receive 0.73 shares of Consol Energy common stock ("Merger Consideration").

4. On November 13, 2020, in order to convince CCR Public Unitholders to vote in favor of the Proposed Transaction, the Defendants authorized the filing of a materially incomplete and misleading Form S-4 Registration Statement (the "Proxy") with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act.

5. In particular, the Proxy contains materially incomplete and misleading information concerning: (i) the financial projections for the Company and Consol Energy; and (ii) the valuation analyses performed by the Conflicts Committee's financial advisor, Intrepid Partners, LLC ("Intrepid").

6. The Proposed Transaction is expected to close in the first quarter of 2021, so the special meeting of CCR's Unitholders to vote on the merger is imminent (the "Unitholder Vote"). Therefore, it is imperative that the material information that has been omitted from the Proxy be disclosed prior to the Unitholder Vote, so CCR's Unitholders can properly exercise their corporate voting rights.

7. For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9. Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction, unless and until the material information discussed below is disclosed to CCR Unitholders sufficiently in advance of the upcoming Unitholder Vote or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

**JURISDICTION AND VENUE**

8. This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

9. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under the traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* at 1316.

10. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District. Indeed, CCR's Common Units trade on the New York Stock Exchange ("NYSE"), which is headquartered in this District. *See, e.g., United States v. Svoboda*, 347 F.3d 471,

484 n.13 (2d Cir. 2003) (collecting cases). Further, Intrepid is located in this District at 540 Madison Avenue, New York, NY 10022.

**PARTIES**

11. Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of CCR Common Units.

12. Defendant CCR is a public company incorporated under the laws of Delaware with principal executive offices located at 1000 CONSOL Energy Drive, Canonsburg, PA 15317. CCR's Common Units are traded on the NYSE under the ticker symbol "CCR."

13. Defendant Jimmy A. Brock is, and has been at all relevant times, a director of the Company, Chairman of the GP Board, and Chief Executive Officer.

14. Defendant Martha A. Wiegand is, and has been at all relevant times, a director of the Company.

15. Defendant Michael L. Greenwood is, and has been at all relevant times, a director of the Company and a member of the Conflicts Committee.

16. Defendant Deborah J. Lackovic is, and has been at all relevant times, a director of the Company.

17. Defendant Kurt R. Salvatori is, and has been at all relevant times, a director of the Company.

18. Defendant Dan D. Sandman is, and has been at all relevant times, a director of the Company and a member of the Conflicts Committee.

19. Defendant Jeffrey L. Wallace is, and has been at all relevant times, a director of the Company and Chairman of the Conflicts Committee.

20. The defendants identified in paragraphs 13 through 19 are collectively referred to herein as the "GP Board" or the "Individual Defendants," and together with CCR, the "Defendants."

## SUBSTANTIVE ALLEGATIONS

**Background of the Company and the Proposed Transaction**

21. CCR is a growth-oriented master limited partnership, sponsored by Consol Energy. The Company's assets include a 25 percent undivided ownership interest and management and control rights in Consol Energy's Pennsylvania mining complex. The Pennsylvania mining complex has three underground mines -- Bailey, Enlow Fork and Harvey -- and related infrastructure. The complex is a highly automated and technologically advanced underground mining operation with 767 million tons of high-Btu bituminous coal reserves in Pittsburgh No. 8 seam. With five longwall mining systems and 17 continuous mining sections, the Pennsylvania mining complex has an annual production capacity of 28.5 million tons. The mining complex also has a train loadout facility with dual rail access to The Norfolk Southern and The CSX, a centralized coal processing facility, as well as access to seaborne markets through CONSOL's wholly-owned Baltimore Marine Terminal.

22. Consol Energy produces and exports bituminous coal. It owns and operates its mining operations in the Northern Appalachian Basin. The company owns and operates the Pennsylvania Mining Complex (PAMC), which comprises the Bailey Mine, the Enlow Fork Mine, the Harvey Mine, and the Central Preparation Plant; and CONSOL Marine Terminal located in the port of Baltimore. As of December 31, 2019, the company had 669.4 million tons of proven and probable coal reserves at PAMC. In addition, it owns approximately 1.5 billion tons of Greenfield reserves located in the Northern Appalachian, Central Appalachian, and Illinois basins.

23. According to the October 23, 2020, joint press release announcing the Proposed Transaction:

> *CONSOL Energy Inc. to Acquire Remaining Public Stake in CONSOL Coal Resources LP*
>
> **CANONSBURG, PA (October 23, 2020)** – CONSOL Energy Inc. (NYSE: CEIX) ("CEIX") and CONSOL Coal Resources LP (NYSE: CCR) ("CCR") today announced that they have entered into a definitive merger agreement pursuant to which CEIX will acquire all of the publicly held CCR common units in an all-stock transaction valued at approximately $34.4 million, based on the most recent closing price of shares of CEIX common stock.

> Under the merger agreement, CEIX will acquire all of the approximately 10.9 million outstanding CCR common units that it does not already own at a fixed exchange ratio of 0.73 shares of CEIX common stock for each publicly held CCR common unit. This exchange ratio represents a 2.1% premium to the volume weighted average exchange ratio during the 20 trading days ended October 22, 2020. In aggregate, CEIX will issue approximately 8.0 million shares in connection with the proposed transaction, representing approximately 22.2% of the total CEIX shares that will be outstanding on a pro forma basis.
>
> "We are extremely excited to announce this transaction, as we believe it will provide significant benefits for both CEIX and CCR stakeholders" said Jimmy Brock, President and Chief Executive Officer of CONSOL Energy Inc. "We firmly believe these two companies are a much healthier entity once consolidated than they would be on a standalone basis, regardless of the circumstance. Simplifying the structure will bring immediate benefits to the combined entity such as improving its consolidated credit metrics, creating financial flexibility and eliminating dual public company costs. In the longer term, we expect this transaction will improve the creditworthiness of the combined entity, while also enhancing capital market access and trading liquidity. Finally, this merger accelerates our ability to return capital to our shareholders."

(Emphasis in original).

24. The Merger Consideration represents inadequate compensation for CCR Common Units. Proxy, 14-16.

25. Therefore, it is imperative that CCR Unitholders receive the material information (discussed in detail below) that Defendants have omitted from the Proxy, which is necessary for Unitholders to properly exercise their corporate suffrage rights and cast an informed vote on the Proposed Transaction.

**The Proxy Omits Material Information**

26. On November 13, 2020, Defendants filed a materially incomplete and misleading Proxy with the SEC. The Unitholder Vote on the Proposed Transaction is forthcoming. The Individual Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's Unitholders to ensure that it did not contain any material misrepresentations or omissions. However, the Proxy misrepresents or omits material information that is necessary for the Company's Unitholders to make an informed voting decision in connection with the Proposed Transaction, and thus the Proxy should be amended.

27. First, the Proxy fails to provide critical information regarding financial projections for the Company and Consol Energy.

28. In particular, the Proxy fails to disclose Net Income projections. Defendants elected to summarize Adjusted EBITDA projections for both CCR and Consol Energy and disclosed that Net Income was in fact a figure used to calculate Adjusted EBITDA. Proxy, 53. However, the Proxy omits Net Income projections entirely. *Id.* Net Income was also a metric utilized by Defendants numerous times in the *Unaudited Pro Forma Consolidated Financial Statement* in the tables on pages F-3 through F-5 of the Proxy. By disclosing certain projections in the Proxy and withholding the Net Income projections, Defendants render the projections on page 53 of the Proxy materially incomplete and provide a misleading valuation picture of CCR and Consol Energy. Simply put, Net Income projections are irreplaceable when it comes to fully, fairly, and accurately understanding a company's projections and value.

29. Most importantly, the Proxy fails to disclose the Company's Unlevered Free Cash Flow projections ("Cash Flow Projections"). It is indisputable that the Cash Flow Projections were the most important input in Intrepid's *Discounted Cash Flow Analysis* for both the Company and Consol Energy because the analysis is based upon discounting the Cash Flow Projections to present value. *Id.* at 75-76. However, Defendants elected to exclude the Cash Flow Projections from the Proxy, despite the fact that they simultaneously elected to include a purported "summary" of Intrepid's *Discounted Cash Flow Analysis*. The omission of the Cash Flow Projections renders the projections on page 53 of the Proxy incomplete and misleading because without the Cash Flow Projections, Unitholders will be misled as to the overall valuation picture of CCR and Consol Energy.

30. The inclusion of EBITDA projections while excluding Cash Flow Projections renders the Proxy incomplete and misleading because Cash Flow Projections are widely recognized as the most important valuation metric when it comes to valuing a company and its stock. EBITDA projection metrics are not sufficient analogs for Cash Flow Projections. Well settled principles of corporate finance and valuation dictate that the value of companies and their stock should be premised

upon the company's projected future cash flows, not projected EBITDA.[1] There are fundamental differences between Unlevered Free Cash Flow and EBITDA. EBITDA is not a sufficient alternative to Unlevered Free Cash Flows—as Warren Buffet and other financial experts have stated: "References to EBITDA make us shudder. Too many investors focus on earnings before interest, taxes, depreciation, and amortization. That makes sense, only if you think capital expenditures are funded by the tooth fairy." [2] Relying solely on EBITDA to provide a fair summary of a company's financial prospects has numerous pitfalls. EBITDA does not take into account any capital expenditures, working capital requirements, current debt payments, taxes, or other fixed costs that are critical to understanding a company's value.[3] As a result of these material differences between EBITDA and Unlevered Free Cash Flows, experts recognize Unlevered Free Cash Flows as a much more accurate measure when it comes to analyzing the expected performance of a company.

31. In light of these significant differences between the Cash Flow Projections and the EBITDA figures, Defendants failure to disclose Cash Flow Projections for CCR and Consol Energy provides a materially incomplete and misleading overall valuation picture for CCR Unitholders.

32. Accordingly, the question that the Company's Unitholders need to answer in determining whether to vote in favor of the Proposed Transaction is clear: Is the Merger Consideration fair compensation given the Company and Consol Energy's Cash Flow Projections? Therefore, Defendants must disclose the Cash Flow Projections for CCR and Consol Energy relied upon by Intrepid.

33. Further, the Proxy also fails to disclose the following figures underlying the

---

1 Pratt, Shannon. "Net Cash Flow: The Preferred Measure of Return." Cost of Capital. 16. ("Occasionally, we find an analyst treating earnings before interest, taxes, depreciation, and amortization (EBITDA) as if it were free cash flow. This error is not a minor matter…").

2 Elizabeth MacDonald, *the Ebitda folly*, FORBES (March 17, 2003), http://www.forbes.com/global/2003/0317/024.html.

3 Cody Boyte, *Why EBITDA is Not Cash Flow*, AXIAL FORUM (Nov. 19, 2013), http://www.axial.net/forum/ebitda-cash-flow/

calculation of Adjusted EBTIDA for both the Company and Energy Consol: (i) Net Income; (ii) income taxes; (iii) net interest expense; (iv) depreciation; (v) depletion and amortization; and (vi) adjustments for certain non-cash transactions. Proxy, 53.

34. If a Proxy discloses financial projections and valuation information, such projections must be complete and accurate. The question here is not the duty to speak, but liability for not having spoken enough. With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths. *See Campbell v. Transgenomic, et al.*, No. 18-2198 (8th Cir., March 1, 2019) (noting that "half-truths" are actionable misrepresentations under securities laws and collecting cases).

35. Unlike poker where a player must conceal his unexposed cards, the object of a proxy statement is to put all of one's cards on the table face-up. In this case only some of the cards were exposed—the others were concealed. If a proxy statement discloses financial projections and valuation information, such projections must be complete and accurate. The question here is not the duty to speak, but liability for not having spoken enough. With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths. Accordingly, Defendants have disclosed some of the information related to the projections relied upon by Intrepid, but have omitted Net Income and Cash Flow Projections, and the figures underlying Adjusted EBITDA.

36. Second, the Proxy omits material information regarding Intrepid's financial analyses with respect to the Proposed Transaction.

37. Intrepid performed a *Comparable Company Trading Analysis* of CCR and Consol Energy, but failed to disclose the individual multiples observed for each of the selected publicly-traded companies. Proxy, 73-75.

38. With respect to CCR's *Discounted Cash Flow Analysis*, the Proxy fails to disclose: (i) the inputs and assumptions underlying the weighted average cost of capital ranging from 13.75% to 17.0% (derived by application of CAPM); (ii) the range of illustrative terminal values regarding CCR's estimated unlevered free cash flow, and the assumptions underlying the applied perpetuity growth rates of (2.0%) to 0.0% used to derive the terminal value; (iii) a range of illustrative terminal values with respect to CCR's estimated legacy liability cash servicing costs, and the assumptions underlying the range of perpetuity growth rates of (1.0%) to 1.0% used to calculate those illustrative terminal values; (iv) CCR's estimated net debt as of December 31, 2020; and (v) CCR's estimated legacy liability cash servicing costs. *Id.* at 75.

39. Similarly, Intrepid failed to disclose the following in Consol Energy's *Discounted Cash Flow Analysis*: (i) the inputs and assumptions underlying the weighted average cost of capital ranging from 13.75% to 16.5% (derived by application of CAPM); (ii) the range of illustrative terminal values regarding Consol Energy's estimated unlevered free cash flow, and the assumptions underlying the perpetuity growth rates of (2.0%) to 0.0% used to derive the terminal value; (iii) a range of illustrative terminal values with respect to Consol Energy's estimated legacy liability cash servicing costs, and the assumptions underlying the range of perpetuity growth rates of (1.0%) to 1.0% used to calculate those illustrative terminal values; (iv) Consol Energy's estimated net debt as of December 31, 2020; and (v) Consol Energy's estimated legacy liability cash servicing costs. *Id.* at 75-76.

40. These key inputs are material to the Company's Unitholders, and their omission renders the summary of Intrepid's Discounted Cash Flow Analyses incomplete and misleading. As one highly-respected law professor explained regarding these crucial inputs, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, Fairness Opinions, 55 Am. U.L.

Rev. 1557, 1576 (2006). Such choices include "the appropriate discount rate, and the terminal value…" *Id.* As Professor Davidoff explains:

> *There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars*….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques. *This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion* ***unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices***. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78 (emphasis added). Without the above-mentioned information, the Company's Unitholders cannot evaluate for themselves the reliability of Intrepid's Discounted Cash Flow Analyses, make a meaningful determination of whether the implied equity value ranges reflect the true value of the Company or were the result of an unreasonable judgment by Intrepid, and make an informed decision regarding whether to vote in favor of the Proposed Transaction.

41. Additionally, Intrepid failed to disclose the premia paid in each transaction observed for its *Precedent Premiums Paid Analysis*. Proxy, 76-77.

42. In sum, the omission of the above-referenced information renders the Proxy materially incomplete and misleading, in contravention of the Exchange Act. Absent disclosure of the foregoing material information prior to the upcoming Unitholder Vote concerning the Proposed Transaction, Plaintiff will be unable to make an informed decision regarding whether to vote his Common Units in favor of the Proposed Transaction, and he is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## CAUSES OF ACTION

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9)**

43. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

44. Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

45. Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

46. The omission of information from a proxy will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

47. Defendants have issued the Proxy with the intention of soliciting the Company's Public Unitholders' support for the Proposed Transaction. Each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things: (i) the financial projections for the Company and Consol Energy; and (ii) the valuation analyses performed by Intrepid in support of its fairness opinion.

48. In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to the Company's Unitholders although they could have done so without extraordinary effort.

49. The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that Intrepid reviewed and discussed its financial analyses with the Individual Defendants, and further states that the Individual Defendants considered the financial analyses provided by Intrepid, as well as its fairness opinion and the assumptions made and matters considered in connection therewith. Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and the details surrounding the process leading up to the signing of the Merger Agreement. The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to, separately, review Intrepid's analyses in connection with their receipt of the fairness opinions, question Intrepid as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

50. The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy. The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and preparation and review of the Company's financial projections.

51. CCR is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

52. The misrepresentations and omissions in the Proxy are material to Plaintiff, who will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Unitholder Vote. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

**COUNT II**

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

53. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

54. The Individual Defendants acted as controlling persons of CCR within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of CCR, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the

decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

55. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

56. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in preparing this document.

57. In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

58. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

59. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

60. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Unitholder Vote or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

B. Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

C. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

D. Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: November 19, 2020

**MONTEVERDE & ASSOCIATES PC**

By: */s/ Juan E. Monteverde*
Juan E. Monteverde (JM-8169)
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel:(212) 971-1341
Fax:(212) 202-7880
Email: jmonteverde@monteverdelaw.com

*Attorneys for Plaintiff*